# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TEXARKANA DIVISION

| | | |
|---|---|---|
| EVELYN GRIGSBY, DENNIS GRIGSBY, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 5:16-CV-00016-RWS |
| | § | |
| v. | § | |
| | § | |
| CITY OF TEXARKANA TEXAS, CITY | § | |
| OF TEXARKANA TEXAS POLICE | § | |
| DEPARTMENT, BRENT LAWING, | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM ORDER ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

The above-entitled and numbered civil action was referred to United States Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. The Report and Recommendation of the Magistrate Judge, which contains her proposed findings of fact and recommendations for the disposition of this action, has been presented for consideration (Docket No. 38). Plaintiffs filed objections (Docket No. 39), and Defendant Brent Lawing ("Lawing") filed a response (Docket No. 40). The Court reviews the Magistrate Judge's findings and conclusions *de novo.* 28 U.S.C. § 636 (b)(1)(C); FED. R. CIV. P. 72(b)(3).

## BACKGROUND

On January 29, 2016, Evelyn Grigsby and Dennis Grigsby, Sr. ("Plaintiffs") filed this lawsuit against Officer Brent Lawing, the City of Texarkana, Texas, and the Texarkana, Texas Police Department (collectively "Defendants") pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. Docket No. 1. Plaintiffs are the parents of Dennis Grigsby, Jr. ("Grigsby"), who was shot and killed by Defendant Lawing of the Texarkana, Texas Police Department on December 15, 2014. *Id.* at ¶ 1. Grigsby was a disabled

African-American male who suffered from schizophrenia and seizures. Docket No. 26-24 at 8:2–9:4.

On July 22, 2016, Lawing filed a motion to compel Plaintiffs to file a Rule 7(a) reply and to limit discovery to whether qualified immunity shielded Lawing from liability. Docket No. 7. The Magistrate Judge granted the motion on September 23, 2016 and ordered Plaintiffs to file a Rule 7(a) reply in response to Lawing's qualified-immunity defense, "delineating specific, concrete facts alleging Lawing's use of deadly force was clearly and unreasonably excessive." Docket No. 19 at 12. After reviewing Plaintiffs' Rule 7(a) reply, the Magistrate Judge found further factual development was necessary to determine whether Lawing's qualified-immunity defense had merit and allowed each side up to three depositions limited to qualified immunity. Docket No. 21 at 2. The Magistrate Judge also ordered the parties to propose a briefing schedule on a summary-judgment motion on the issue of qualified immunity. *Id*.

The parties engaged in limited discovery in early 2017. On May 30, 2017, Lawing filed the present motion for summary judgment on the basis of qualified immunity. Docket No. 26. The Magistrate Judge allowed Plaintiffs two extensions of time in which to file a response to the motion. Docket Nos. 30, 32. After granting Lawing's unopposed motion to continue the original hearing, the Magistrate Judge conducted a hearing on the motion on August 9, 2017. Docket Nos. 35, 37.

## REPORT AND RECOMMENDATION

On August 21, 2017, the Magistrate Judge issued a 41-page Report and Recommendation, recommending that Lawing's motion for summary judgment be granted and that Plaintiffs' case against Lawing be dismissed with prejudice. Docket No. 38. After reviewing the summary-judgment evidence, the Magistrate Judge concluded that the uncontested facts "show Grigsby

rushed toward Lawing inside the garage of [neighbors Curtis Owens and Tamerow Harris's] home (with minor children inside) holding a shiny metal object in his hand which Lawing reasonably believed to be the blade end of a knife." *Id.* at 35. According to the Magistrate Judge, the summary judgment evidence established that Grigsby had raised his arm above his head in a threatening manner, was moving towards Lawing, and was within three or four feet of Lawing at the time he was shot. *Id.* at 40. Once the object was removed from Grigsby's hand, the officers determined it was a spoon that he had held from the scoop or bowl end. *Id.* at 16.

Ultimately, the Magistrate Judge found that it was "certainly reasonable" in these circumstances for Lawing to use deadly force "to abate the threat to himself and others nearby." *Id.* at 35 (quoting *Mace ex rel. Revill v. City of Palestine, Texas*, 213 F. Supp. 2d 691, 696 (E.D. Tex. 2002), *aff'd sub nom. Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003)). Noting the deadly force inquiry is confined to whether the officer was in danger at the moment of the threat that resulted in the officer's use of force, the Magistrate Judge concluded that "it would be reasonable for an officer in the same circumstance, seeing the six-inch stem of the spoon in the hand of a burglary suspect, to believe the object was a knife and that he was in danger of immediate and serious harm." *Id.* at 35.

The Magistrate Judge further noted Plaintiffs could not rebut the qualified immunity defense based on their criticisms or claims of negligence before the moment of threat. *Id*. at 37. These included Plaintiffs' assertions that:

    (1) Lawing used extremely poor judgment and was plainly incompetent from the point he arrived at the scene;

    (2) Lawing should have parked his patrol unit in the driveway with his headlights on to illuminate the driveway;

    (3) Lawing should have rung the doorbell and entered the residence;

(4) Lawing should have waited for backup to arrive instead of drawing his gun and proceeding in a manner where he needlessly put himself in alleged harm's way;

(5) Lawing should have pulled the tarp from the garage entrance, allowing him to safely determine if Grigsby was inside;

(6) Lawing should have considered Grigsby's moaning, along with the report that the intruder was wearing pajama bottoms and was barefoot, in processing the threat of harm; and

(7) Lawing should have identified himself and used more elaborate verbal commands.

*Id.* at 23–34, 37. According to the Magistrate Judge, all of Plaintiffs' criticisms relate to what transpired or could have transpired before the shooting in Owens's garage. *Id.* at 37. Relying on *Young v. City of Killeen,* 775 F.2d 1349 (5th Cir. 1985), and *Fraire v. City of Arlington,* 957 F.2d 1268 (5th Cir. 1992), the Magistrate Judge found that "regardless of what had transpired up until the shooting itself," Grigsby's movements gave Lawing "a reason to believe, at that moment, that there was a threat of physical harm" so as to justify the use of force. *Id.* at 35–37; *see also Fraire*, 957 F.2d at 1276. The Magistrate Judge concluded that the issues raised by Plaintiffs simply "do not create the kind of genuine dispute that can overcome summary judgment in excessive force cases involving police shootings." *Id.* at 37 (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 385 (5th Cir. 2009)).

The Magistrate Judge ultimately concluded there is no evidence that Lawing's use of deadly force was clearly excessive or objectively unreasonable. *Id.* at 40. According to the Magistrate Judge, Lawing has met his burden of proving qualified immunity, and Plaintiffs have not identified any facts supporting their position that Lawing's actions were unjustified. *Id.* Accordingly, the Magistrate Judge recommended that Lawing's motion for summary judgment be granted and that Plaintiffs' case against Lawing be dismissed with prejudice. *Id.*

**PLAINTIFFS' OBJECTIONS**

On September 4, 2017, Plaintiffs filed written objections to the Report and Recommendation (Docket No. 39). Plaintiffs argue that the Magistrate Judge erred in "determining that Lawing did not hear the moaning of Dennis Grigsby as he was approaching the garage where Dennis was located on the night in question," and in "determining that Lawing did not act unreasonably by failing to identify himself as a police officer when he approached or entered the garage." *Id*. at 1. According to Plaintiffs, "Defendants have failed to establish as a matter of law that their conduct in connection with Plaintiffs' claims did not violate clearly established statutory or constitutional rights of which a reasonable person would have known" and that "their conduct was 'objectively reasonable' under the circumstances presented." *Id*. at 2.

## *DE NOVO* REVIEW

**I.  Summary Judgment Evidence**

The Report and Recommendation contains a thorough and detailed narrative of the summary judgment evidence. The Court highlights the following for purposes of its *de novo* review.[1] At 1:50 a.m. on December 15, 2014, Tamerow Harris ("Harris") called 911 and advised that someone was in her garage at 2800 Page Street in Texarkana, Texas. Docket No. 26-2 (Def. Ex. 3) at 1 (TEX01580); Docket No. 26-3 (Harris Aff.) at 4. Harris and Curtis Owens ("Owens") lived at 2800 Page Street with their seven children, ages three through 15 years at the time. Harris Aff. at ¶ 2. Owens is a mechanic and, on the night in question, had multiple "tools, knives and other implements" scattered across the garage floor next to a BMW. Docket No. 26-5 (Owens Aff.) at ¶ 4; Docket No. 26-12 (Def. Ex. 9A).

---

[1] Defendants submitted both Lawing's dashcam video and body mic audio in support of their motion for summary judgment. *See* Docket Nos. 26-1, 26-2. The Court relies on both of these sources of evidence heavily throughout this section—particularly to describe the timing of the events in question.

During the call between Harris and the 911 operator, Harris advised that the intruder was in the garage, was wearing pajama pants and a blue shirt, and was trying to break the window to the children's bedroom with a tool in his hand. This information was relayed to Lawing verbally by the dispatcher and was also displayed on his patrol unit's computer call notes. Docket No. 26-7 (Lawing Dep.) at 22:10–15; Docket No. 26-25 (Def. Ex. 15). Lawing arrived at 1:53:09 a.m. Def. Ex. 3.

Lawing considered the residents at risk of serious harm. Lawing Dep. at 23:12–18, 37:6–10. Lawing drew his weapon for self-defense and for defense of the people in the house. *Id*. at 24:7–22. Lawing did not know whether the intruder had a gun, and Lawing believed that if he verbally commanded the intruder to "come out," the sound of his voice would have helped give away his position. *Id*. at 27:11–12, 50:20–51:6. It was dark in the driveway, and Lawing could not see inside the "average size two-car garage" because of a covering. *Id*. at 28:21–24, 35:7–15.

The entrances to the two-car garage were covered with tarps. *Id.* at 42–44. Lawing first attempted to enter through the tarp on his right, or the east side of the garage, but appeared to be nailed or stapled on all sides. *Id.* at 44:4–8; Docket No. 26-13 (Def. Ex. 9B), Docket No. 26-15 (Def. Ex. 9D). He then moved to the left tarp and was able to enter on the right side of this tarp, or essentially in the middle of the garage. Lawing Dep. at 42:17–22, 44; Def. Ex. 9B. Lawing was holding his gun in his right hand and a flashlight in his left hand, and he used the end of his flashlight to push the tarp aside; the tarp was not secured completely on the right side. Lawing Dep. at 42:20–24.

Other than hearing "tapping" coming from inside the garage,[2] Lawing did not hear anything else at this point. *Id.* at 44:21–25, 46:12–15. There were no lights on inside the garage, and Lawing's flashlight provided the only illumination. *Id*. at 46:20–24. After he moved the tarp back, Lawing directed the flashlight to the left side of the garage to clear his blind side. Seeing no one to his left, Lawing then stepped inside and "proceeded to come back around to the right to clear the rest of the garage." *Id*. at 47:22–23; Def. Ex. 9D.

As Lawing was coming back to the right, using his flashlight for illumination, he saw a vehicle and the back of the intruder's head as the intruder crouched down on the other side of the vehicle. Lawing Dep. at 47:25–48:23; Def. Ex. 9A; Docket No. 26-14 (Def. Ex. 9C). As soon as his light shone on the back of Grigsby's head, Grigsby stood up, turned toward Lawing, raised his right arm, began to walk around the front of the vehicle approaching Lawing and said "[y]ou better shut that light out of my face." Lawing Dep. at 48:23–50:5; Docket No. 26-18 (Womack Aff.) at ¶ 8. At that time Lawing saw in Grigsby's hand a shiny metal object that he believed to be a knife. Lawing Dep. at 48–49, 87–88; Womack Aff. at ¶ 8.

Two seconds after Grigsby said these words, while approaching Lawing with his right arm raised and holding in his right hand the shiny metal object, Lawing commanded the intruder to "[h]ey, set it down. Set it down, man. Set it down!" Docket No. 26-1 (Def. Ex. 2) at 0:36, *see also* Womack Aff. at ¶ 9. Several individuals at the scene believed Grigsby to be holding a sharp and shiny object. *See* Lawing Dep. at 48:22–49:1; Owens Aff. at ¶ 15; Docket No. 26-8 (Smith Aff.) at ¶ 5; Docket No. 26-10 (Buster Aff.) at ¶ 5; *see also* Docket No. 26-1 (Def. Ex. 2) at 1:09 (during

---

[2] On multiple occasions during the 911 call, the operator asked where the intruder was located, and Harris repeatedly stated the intruder was at the bedroom window, had a tool in his hand and could break the window. Harris Aff. at ¶ 5. At one point in the call, Harris shouted to the operator that the intruder was trying to break the window and requested that the police "[p]lease hurry!" *Id.* According to Owens, the male intruder continued beating on the window, and he thought the intruder was trying to knock it out. Owens Aff. at ¶ 6.

which Owens describes Grigsby as stabbing the window). According to Lawing, Grigsby did not obey his command to put the object down and continued approaching Lawing. Lawing Dep. at 51:15–52:7, 89:1–22. Lawing attempted to retreat by stepping backwards, but his feet made contact with the tarp and he could not back up any further. *Id.* at 52:2–7, 89:9–11.

When Grigsby was within three or four feet of him, Lawing fired a single shot into Grigsby's chest. *Id*. at 52:13–25. Lawing feared for his life because of the object Grigsby had in his raised hand. *Id*. at 88:22–89:2. According to Lawing, Grigsby "had his arm raised with it protruding from the bottom of his hand. It was in a stabbing motion." *Id.* at 89:1–2. Lawing feared Grigsby was going to stab him, and he fired his service firearm in self-defense.[3] *Id*. at 89:17–22; Womack Aff. at ¶ 9.

## II. Qualified Immunity

Lawing moved for summary judgment on Plaintiffs' claims against him on the basis of qualified immunity. The doctrine of qualified immunity shields governmental officials, including law enforcement officers, performing discretionary functions in the course of their official duties from liability as well as from suit. *See Babb v. Dorman,* 33 F.3d 472, 477 (5th Cir. 1994). "Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008) (internal quotation marks omitted). The standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). A plaintiff bears the burden of negating a properly raised qualified immunity defense. *Id.*

---

[3] The audio from Lawing's body mic reveals that five to six seconds elapsed from the moment Grigsby spoke the words "[y]ou better shut that light out of my face" until Lawing fired his weapon. Def. Ex. 2; Lawing Dep. at 88–89.

The Supreme Court has articulated a two-part test for resolving government actors' claims of qualified immunity. A court must determine both (1) whether the public official's conduct violated an actual constitutional right and (2) whether the public official's actions were "objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* (internal quotation marks and citations omitted). The court may rely on either prong of the defense in its analysis, and both are matters of law for the court. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

### III. Discussion

Lawing does not dispute that the Fourth Amendment right to be free from excessive force during a seizure is clearly established. Docket No. 26 at ¶ 5.10. Lawing asserts the critical question is whether his actions were clearly excessive and objectively unreasonable and, thus, violations of this right. *Id.* According to Lawing, there is no evidence supporting Plaintiffs' claim that Lawing's use of deadly force was unconstitutional. *Id.* at ¶ 5.11. Rather, when considering the seriousness of the reported crime to which he was dispatched, the threat presented by Grigsby, and the limited time in which Lawing had to respond to the threat, Lawing argues he was justified in using deadly force in self-defense to avoid serious bodily injury or death. *Id.*

It is clearly established that individuals have the right under the Fourth Amendment to be free from excessive force during such a seizure. *See Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citation omitted). To establish a claim of excessive force, a plaintiff must demonstrate "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005). Whether the force used was excessive or unreasonable depends on the "totality of the circumstances." *Tennessee v. Garner,* 471 U.S. 1, 8–9 (1985). In making

this determination, the court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Poole,* 691 F.3d at 627–28.

The reasonableness inquiry must be judged from the perspective of a reasonable officer on the scene "in light of the facts and circumstances confronting them, rather than the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Use of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Mace v. City of Palestine,* 333 F.3d 621, 624 (5th Cir. 2003).

In the Fifth Circuit, police officers are not liable under the Fourth Amendment for negligently creating circumstances that lead to an otherwise justified shooting. For example, in *Young v. City of Killeen,* 775 F.2d 1349 (5th Cir. 1985), even though the officer had allegedly violated six police procedures, the officer could not be constitutionally liable because "the only fault found against [the officer] was his negligence in creating a situation," causing him to mistakenly believe an individual posed a threat of serious harm. *Id*. at 1353.

In *Fraire v. City of Arlington,* 957 F.2d 1268 (5th Cir. 1992)*,* the court considered a qualified immunity defense after a plain-clothes officer shot and killed the driver of a vehicle as the driver tried to run over the officer in an attempt to flee. *Id*. at 1270–73. Relying on the holding in *Young,* the Fifth Circuit rejected "[t]he implication that [the officer] thereby manufactured the circumstances that gave rise to the fatal shooting" because he "failed to follow established police procedures in displaying his badge and identifying himself while in plain clothes." *Id.* at 1275. The court stated "regardless of what had transpired up until the shooting itself, Young's movements gave the officer a reason to believe, at that moment, that there was a threat of physical harm" so as

to justify the use of force. *Id.* at 1276. In other words, "even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections." *Id.*

In their objections, Plaintiffs contend Lawing should have heard Grigsby's moaning as he approached the garage and, in processing the threat of harm, should have taken into account the fact that Grigsby was reported to be wearing pajamas.[4] Plaintiffs argue that Lawing should have identified himself as a police officer and commanded Grigsby to come out of the garage before using deadly force. Docket No. 39 at 4–5.

These issues were addressed extensively by the Magistrate Judge in the Report and Recommendation and do not affect the ultimate issue of whether Lawing believed there was a threat of physical harm when he fired his weapon at Grigsby. Plaintiffs' objections relate to what transpired before the shooting inside Owens's garage. But, as noted by the Magistrate Judge, the excessive force inquiry is limited to whether Lawing reasonably believed he was in danger at the moment of the threat that resulted in Lawing's shooting. Docket No. 38 at 32 (citing *Harris v. Serpas,* 745 F.3d 767, 772 (5th Cir. 2014)). The uncontroverted evidence regarding the relevant time frame reveals the following.

The audio recording from Lawing's body mic makes clear that, after Grigsby stated, "[y]ou better shut that light out of my face," Lawing immediately commanded Grigsby, three times, to drop the object in his hand before the gunshot was fired. Grigsby did not obey these commands and continued his approach with his arm raised. Lawing Dep. at 51:15–52:7, 89:1–22. Lawing

---

[4] Plaintiffs specifically assert the Magistrate Judge erred in determining Lawing did not hear Grigsby's moaning. The Magistrate Judge correctly noted Lawing testified that he heard a "tapping" noise as he approached the garage. There is no evidence he heard any moaning coming from the garage. Even so, the Magistrate Judge assumed Lawing did hear the moaning and stated it would not change her finding that at the time deadly force was employed Lawing had reason to believe there was a threat of physical harm. Docket No. 38 at 38.

stated that he feared for his life, thinking Grigsby was going to stab him, and he shot Grigsby in self-defense when Grigsby was three to four feet away.

As the Magistrate Judge noted, Lawing's testimony is corroborated by Harris and Owens, the only other eyewitnesses to these initial events. Plaintiffs have provided no evidence to the contrary. It is undisputed Grigsby had been beating on the window of Owens's house from inside the garage with what Harris and Owens described initially as a tool. Harris reported seeing the illumination from Lawing's flashlight as he entered the garage. Harris testified that she heard Lawing tell Grigsby to drop the object. She then saw Grigsby approach Lawing at a fast pace with his arm raised and holding a dangerous object. Harris Aff. at ¶ 12.

When Owens got outside of the house after the shot was fired and saw Grigsby and Lawing "tussling" partly inside the garage and partly outside in the driveway, Owens believed Grigsby was holding an icepick or knife. Both Harris and Owens thought Grigsby was attempting to attack or stab Lawing with the object he was holding in his hand. According to Owens, when he went outside after the shot was fired and saw Lawing and Grigsby "tussling" on the ground, Grigsby "was still trying to stick the officer with. . . the sharp object" he had in his hand. Docket No. 26-6 (Owens Statement) at 6. They both believed Lawing fired in self-defense.[5]

---

[5] This evidence distinguishes a case relied upon by Plaintiffs in their objections, *Aguilar v. Williamson County, Texas*, 2011 WL 13137575 (W.D. Tex. 2011). *Aguilar* was a § 1983 case brought by a motorcyclist who was injured in a traffic stop. The case was affirmed in part, reversed in part, and remanded by the Fifth Circuit in *Aguilar v. Robertson*, 512 Fed. Appx. 444 (5th Cir. 2013).

The Fifth Circuit made clear on appeal "that once the plaintiff stops resisting or is in [the officer's] control, the permissible degree of force lessens." *Id*. at 450. In *Aguilar*, the plaintiff claimed that a police officer "tackled him off [his] motorcycle onto the ground, used his firearm to hit and poke [the plaintiff] in the head and visor, and kicked him in the leg." *Id.* Because the officer allegedly took those actions while the plaintiff "was stopped, not ignoring commands, and was not resisting arrest," the Fifth Circuit held the plaintiff had adequately alleged a violation of a constitutional right. *Id.*

Here, there is no evidence that Grigsby stopped resisting Lawing's commands. Rather, the uncontested evidence shows Lawing feared for his safety and fired in self-defense as Grigsby approached him with his arm raised in a threatening manner. Even after Grigsby was shot, Owens thought he was "still trying to stick the officer with. . . the sharp object" he had in his hand. Owens Statement at 6.

As stated above, the reasonableness of the use of deadly force "requires analyzing the totality of the circumstances," *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014), and must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham,* 490 U.S. at 396-397. Plaintiffs' objections focus on and question the decisions made by Lawing leading up to the moment of threat in Owens's garage. However, the competent summary-judgment evidence establishes that when Grigsby was three or four feet away from Lawing with his arm raised in a threatening posture, Lawing was justified in using deadly force in self-defense, and his actions were objectively reasonable.

## IV.    Cases relied upon by Plaintiffs

In support of their objection regarding Lawing's failure to identify himself as a police officer, Plaintiffs rely on *Schaefer v. Whitted*, 121 F. Supp.3d 701 (W.D. Tex. 2015). In *Schaefer*, the Western District of Texas held the plaintiff's excessive force claims survived the pleading requirements set forth in FED. R. CIV. P. 12 and were best resolved on an evidentiary record by summary judgment or trial. *Id*. at 720. The case arose when Schaefer was shot and killed by an officer after a confrontation on Schaefer's property. *Id.* at 706. According to the complaint, Schaefer was attacked by a neighbor's pit bull while on his own property, and he shot the dog using a firearm that he was licensed to carry in the State of Texas. *Id*. at 707. Schaefer immediately reported his actions to the police, and during the ensuing conversations with the 911 dispatchers, Schaefer was asked to put away his weapon before the police arrived to investigate. *Id.* Schaefer refused. *Id.* Based on a prior encounter with the police, Schaefer did not believe being armed could be construed by an officer as a threat to his or her safety. *Id.*

When the officer arrived, he entered Schaefer's backyard without announcing himself, requesting permission, or obtaining a warrant. *Id*. Schaefer exited the front door with his gun

"holstered." *Id*. According to the court,

> [w]ithout identifying himself, and without warning, [Officer] Whitted immediately grabbed Schaeffer's [sic] left arm in an attempt to physically remove the gun from its holster. In response, and in self defense, Schaeffer [sic] extended his left arm to repel Officer Whitted's advance while simultaneously securing his gun with his right hand and taking it out of his waistband. According to Officer Whitted's police report, Schaefer pivoted to face him squarely and then directly pointed his gun so Officer Whitted was looking down the barrel. At this point, Whitted shot Schaeffer [sic] two times in the chest, killing him.

*Id.* (internal quotations and citations omitted). The *Schaefer* court explained that the facts and circumstances confronting the officer "did not suggest there was any need to use force before first commanding Schaefer to surrender his weapon." *Id*. at 714. Specifically, the court explained that the facts indicated that it was plausible that the officer's actions amounted to more than mere negligence:

> Schaefer was on his own property, had reported his own conduct to police, and was lawfully in possession of the firearm holstered on his hip. There are no allegations Schaefer was uncooperative or belligerent upon exiting the home, made any attempt to assault the investigating officer, nor otherwise took any action Officer Whitted could be perceived as threatening. Moreover, armed with the knowledge Schaefer would be carrying a holstered weapon he was licensed to possess, Officer Whitted nonetheless entered Schaefer's property alone without announcing himself to investigate the scene and positioned himself a few feet from the front door, anticipating Schaefer's arrival. Although each act may only amount to a mere negligent violation of police procedures, these decisions are inconsistent with a subjective belief Schaefer posed an immediate, credible threat of harm. There was no need to forcefully attempt to disarm Schaefer absent any verbal warning and it is plausible doing so was more than mere negligence.

*Id*. The court distinguished *Thomas v. Murray*, 107 F. Supp. 2d 748 (N.D. Tex. 2000), a case decided on a summary-judgment record, noting there the investigating officer did feel threatened and had repeatedly asked for the plaintiff's gun before resorting to physical force. *Id.* at 715.

In *Schaefer*, the officer did not announce himself as a police officer nor did he request or command Schaefer to surrender his weapon: "[The officer] chose to make personal contact with him anyway, . . . bel[ying] any argument Officer Whitted was subjectively concerned Schaefer

posed an immediate threat to his safety." *Id.* There were also conflicting statements in the pleadings concerning whether Schaefer actually pointed his gun at the officer and allegations that forensic evidence contradicted the officer's story. *Id.* at 707.

According to the *Schaefer* court, by "confronting Schaefer on the patio knowing he would be carrying a weapon, and by immediately attacking Schaefer without first announcing himself as police, it is plausible Officer Whitted was aware of the high likelihood Schaefer would react by extending his arm to protect himself or reaching to secure his weapon." *Id*. at 715. Therefore, accepting the facts alleged as true, the court found "physically assaulting Schaefer before commanding him to drop the gun was a reckless abuse of police power directly inducing the action now used to justify the shooting." *Id.* Under those circumstances, the court found the plaintiff stated a Fourth Amendment claim against the officer based on the assault, "even where the shots themselves may [have been] justified." *Id*.

The facts and circumstances of *Schaefer* differ significantly and importantly from those of this case. As the court in *Schaefer* explained,

> *Young* and *Fraire* make clear Plaintiff cannot succeed on the claim Officer Whitted's negligence in failing to identify himself, failing to command Schaefer to surrender the weapon, or failing to call for backup when he knew Schaefer had a gun and this negligence was the proximate cause of Schaefer's death. . . . However, *Young* and *Fraire* are silent where, as here, Plaintiff alleges Officer Whitted's unprovoked assault was not a negligent failure to follow police protocol, but instead independently qualifies as the precise type of objectively unreasonable conduct the Fourth Amendment is designed to protect against. Further, Young and Fraire did not involve suspects who were induced or forced by the officer to engage in the act that ultimately justified the shooting nor was the act arguably justifiable self-defense.

*Id.* at 713–714. According to the court, "Schaefer's motion to secure his weapon—the only action serving to justify Officer Whitted's shooting—arose as a direct and perhaps justified response to an allegedly gross abuse of police power." *Id*. at 714. To the extent the officer "manufactured"

his own legitimate fear of serious bodily injury by recklessly and unjustifiably physically attacking Schaefer, the court found the case distinguishable from *Young* and its progeny. *Id.*

Here, the record is devoid of evidence suggesting Lawing recklessly or unjustifiably "manufactured" his own legitimate fear of serious bodily injury. Rather, this case involves an act of justifiable self-defense, as demonstrated by the evidence presented and the Magistrate Judge's analysis of Fifth Circuit precedent regarding the application of qualified immunity. Docket No. 38 at 26–32.

Unlike the situation in *Schaefer*, here, Lawing responded to a report of a burglary-in-progress at a residence and feared the residents inside the house were in danger.[6] When Lawing entered the dark garage with his flashlight, Grigsby began to approach Lawing at a fast pace with his right arm raised in an attack position. Lawing saw Grigsby holding a shiny metal object in his hand, which Lawing believed to be the blade end of a knife. Lawing commanded Grigsby three times to "set it down," but Grigsby continued his approach. Lawing was unable to retreat, given the presence of the tarp, and shot Grigsby in self-defense when Grigsby was within three or four feet of him. Grigsby was not "induced or forced by the officer to engage in the act that ultimately justified the shooting." *Schaefer*, 121 F.Supp.3d at 714. Thus, the Fifth Circuit's holdings in *Young* and *Fraire* are instructive.

The Court further notes the court in *Schaefer* denied qualified immunity at the motion to dismiss stage, noting that whether the officer acted negligently, recklessly or objectively

---

[6] In their objections, Plaintiffs rely on *Tennessee v. Garner*, 471 U.S. 1 (1985), asserting the Court stated in that case that nighttime burglary involving an unarmed suspect is not so dangerous a crime to automatically justify the use of deadly force. *Id.* at 21. The officer in *Garner* "did not have probable cause to believe that Garner, whom he correctly believed to be unarmed, posed any physical danger to himself or others." *Id.* at 21. In fact, the officer never "attempted to justify his actions on any basis other than the need to prevent an escape." *Id.* According to the Court in *Garner*, where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* at 11.

unreasonably were issues "best left to be decided on a developed record at summary judgment." *Schaefer*, 121 F.Supp.3d at 716. Here, the Magistrate Judge allowed the parties to conduct discovery on the issue of qualified immunity and recommended qualified immunity be granted based on a fully developed record at summary judgment, rather than at the motion to dismiss stage.

Plaintiffs also rely on *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012)[7], for the proposition that an officer's use of force should correspond to the amount of resistance being offered by a suspect. According to Plaintiffs, "if a suspect is offering no active resistance, then force should be scaled down to meet that compliance." Docket No. 39 at 3. Here, the undisputed evidence reveals Grigsby failed to comply with Lawing's commands to drop the object he was holding in his hand. According to Harris, Grigsby approached Lawing at a fast pace while appearing to attack Lawing with his arm raised and holding a dangerous object. Harris Aff. at ¶ 12.

## **CONCLUSION**

The uncontested facts and evidence detailed in the Report and Recommendation demonstrate Grigsby rushed toward Lawing inside the garage of Owens's home with a shiny metal object in his hand, which Lawing reasonably believed to be the blade end of a knife; Grigsby had raised his arm above his head in a threatening manner; Lawing ordered Grigsby three times to "set it down"; and Grigsby was within three or four feet of Lawing and moving toward him when Lawing fired his weapon. As Lawing's counsel acknowledged at the summary judgment hearing, this case involves a "tragic, unfortunate circumstance" (Hearing Tr., Aug. 9, 2017, p. 20).

---

[7] In *Poole*, the suspect did not "give up his right arm" to allow himself to be handcuffed and later kicked and screamed at the officers. 691 F.3d at 629. In response, the officers issued verbal commands and tried grabbing his arm, before finally applying and withdrawing a taser "very quickly." *Id*. The Fifth Circuit focused on the fact that the ascending use of force corresponded with the suspect's increasing resistance and found the force used was not excessive. *Id*.

However, the Court agrees with the Magistrate Judge that it would have been reasonable for an officer in the same circumstances, seeing the six-inch stem of a spoon in the hand of a burglary suspect, to believe the object was a knife and that he was in danger of immediate and serious harm.

Having reviewed the underlying briefing, the Report and Recommendation, and Plaintiffs' objections, the Court finds Plaintiffs' objections are without merit and the findings and conclusions of the Magistrate Judge are correct. The Court therefore adopts the Report of the United States Magistrate Judge as the findings and conclusions of this Court. Accordingly, it is hereby

**ORDERED** that Defendant Brent Lawing's Motion for Summary Judgment (Docket No. 26) is **GRANTED.** It is further

**ORDERED** that Plaintiffs' above-entitled and numbered cause of action is **DISMISSED WITH PREJUDICE** with respect to Defendant Brent Lawing.

**So ORDERED and SIGNED this 22nd day of March, 2018.**

*(signed)* Robert W Schroeder III
ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE